J-S16002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
BERNARD ROY BEAIR, JR. :
:
Appellant : No. 1340 MDA 2017
:

Appeal from the PCRA Order July 27, 2017
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0000425-2006

BEFORE:   BOWES, J., MURRAY, J., and PLATT*, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 27, 2018**

Bernard Roy Beair, Jr. appeals from the order denying his PCRA petition raising a claim of after-discovered evidence in the form of recantation.  We affirm.

Appellant herein was convicted of, *inter alia*, rape and incest, and sentenced to fifteen to thirty-six years incarceration.  During the evidentiary hearing on this matter, the PCRA court remarked that "This case has been troubling since day one."  N.T., 5/10/16, at 29.  The circumstances and factual history leading to that characterization are relevant to the issue raised during these PCRA proceedings.  We therefore set forth those facts as referenced in our prior memorandum, which discussed the history of the case in the context of a weight of the evidence claim.

> Beair points to many unusual circumstances in this case to buttress his contention that the verdicts shocked a sense of

_____
* Retired Senior Judge assigned to the Superior Court.

justice. While we agree with Beair that this case is unusual, we cannot conclude that his conviction shocks a sense of justice. In June of 1996, Beair's five children were removed from his custody and placed in the care of their maternal grandmother, Vilma, by Montgomery County Children and Youth Services ("MCCYS"). Shortly thereafter, Beair's two oldest daughters told Vilma that they had been abused by Beair. Vilma contacted a local therapist who worked with the girls for over a year before reporting the allegations of abuse to the authorities.

A caseworker for MCCYS interviewed Beair's two oldest daughters regarding the allegations twice, the second time with a local police officer. During the second interview, one daughter denied any form of sexual abuse. The officer did not pursue the investigation any further, and neither did MCCYS. Vilma, however, was still adamant that the children had been abused.

Approximately two weeks after the last interview, Vilma contacted the Chief of Police in a neighboring municipality. The Chief of Police interviewed the girls and referred the case to the Montgomery County District Attorney's Office for further investigation and prosecution. However, the District Attorney's office never pressed charges against Beair. In April of 2004, Berks County Children and Youth Services ("BCCYS") received an allegation of sexual abuse and opened an investigation. BCCYS dispatched a sexual abuse investigator to interview Beair's oldest daughters. After completing the interview, the investigator referred the case to Detective Thomas Yeich of the Berks County District Attorney's Office. After a lengthy investigation, Detective Yeich filed a criminal complaint against Beair in January of 2006. At about the same time, two of Beair's other children, who were still living with Vilma, relocated to their mother's home in Utah, claiming that Vilma had abused them and forced them to fabricate stories about Beair.

The trial court, in addressing this issue stated the following:

> At trial, [Beair's 2 older daughters] testified that [Beair] physically and sexually abused them while they were in his care. Both women testified that [Beair] whipped them with his belt, kicked them with steel-pointed cowboy boots, banged their heads together and clubbed them. [One daughter] testified that [Beair] forcibly raped her and [the other daughter] testified that [Beair] forced her to perform

- 2 -

> sexual acts. Furthermore, their testimony was corroborated by the testimony of Grandmother Vilma as well as several mandatory reporters. It is conceded that there was conflicting evidence as well as evidence of motive to fabricate and/or exaggerate the facts against [Beair]. Notwithstanding such evidence (including conflicting testimony from [Beair's son and younger daughter] and the admittedly surreal facts of the case) it is clear to the Court that the jury could have believed, beyond a reasonable doubt, that [Beair] physically and sexually abused his daughters. . . . This Court declined to overturn the jury's well-considered verdict and maintains that the convictions in this complex case do not rise to the level necessary to overturn them based on a challenge to the weight of the evidence.

*Commonwealth v. Beair*, 548 MDA 2011 (Pa.Super. 2011) (unpublished memorandum) (alterations in original).

Appellant sought review with our Supreme Court, which denied his petition on April 25, 2012. *Commonwealth v. Beair*, 44 A.3d 1160 (Pa. 2012)*.* Appellant filed a timely *pro se* petition for PCRA relief on November 11, 2012, and counsel was appointed. The proceedings languished for some time, resulting in the appointment of new counsel, who filed an amended petition on September 29, 2015. The amended petition raised three claims, including the assertion that L.B., one of the two daughters mentioned in the aforementioned discussion, would recant her testimony.

PCRA hearings were held on January 21, 2016, and May 10, 2016, which solely addressed the recantation claim. The PCRA court denied relief, and Appellant filed a timely notice of appeal. Appellant complied with the order to

file a Pa.R.A.P. 1925(b) statement, and the PCRA court authored its opinion in response. The matter is ready for review of Appellant's two claims:

> I. Did the PCRA court err in dismissing the Appellant's PCRA petition based upon the evidence of record that the chief accusing witness acknowledged in a text message that she lied during the trial and the Commonwealth conceded at the May 10, 2016 hearing that the text message transcript is authentic and the text messages, sent to and received by both the accusing victim and her uncle, were on each party's phone and given that the accuser denied that she had any text message with her uncle in which she had admitted that she had previously lied in court and given that the accuser lied when she said that her uncle had offered to pay her money in exchange for false testimony in Court?
>
> II. Did the PCRA court fail to assess the credibility of recanted testimony and its significance in light of the trial record?

Appellant's brief at 4 (citations omitted).

The instant appeal largely centers on the PCRA evidentiary hearings, and we therefore set forth those additional facts. During the preparation of Appellant's amended PCRA petition, Appellant and his counsel received transcripts of text messages between Donald Beair, Appellant's brother, and his niece, L.B. These messages spanned May 8, 2014, through September 18, 2014, in which the following conversation occurred on May 9, 2014 (reproduced verbatim):

> [L.B.]: Yes but Uncle Donnie I put him in jail. I deserve him to hate me and shun me.
>
> [Donald]: I talk to [your father] weekly. He misses u all. You r family. He forgives you. He understands. You got me tearing up.
>
> [L.B.]: Omg I didn't mean that I'm so sorry. But for u and ur family I will get him out jail. Even if I ended up in jail myself I still get him out.

[Donald]: If u tell the truth.  Everything will b ok.  I promise.  Lets put this behind us.  And move on

[L.B.]: Ok I will but its not my grand mothers fault like everyone wants to say.  Its my Own.

[Donald]: Y is it your own?

[L.B.]: Because my grandmother didn't tell me what to say.  I'm at fault.  if anyone should get in trouble it should be me

. . . .

[Donald]: **But y would you say all those lies?**

[L.B.]: **I can't remember what bought it on**. . . .

N.T., 5/10/16, at 46 (emphases added).[1]

L.B. texted other comments to Mr. Beair, including "If u talk to my dad tell him [I] said hi that I love him and that I'm so sorry[.]" *Id*. at 49.  After informing Mr. Beair that she planned to move to Virginia, she stated: "Actually I was gonna contact u when I get down there and ill help u from there.  But u can not tell my sisters and brother that I'm in VA.  I'm gonna do this for u and for gram so that my dad will have his freedom." *Id*. at 75.  "I will help u get my dad out of jail uncle donnie.  Like I said I'm doing this for u and gram and the rest of the family and that's it not for rach or stefy.  Only for u guys." *Id*. at 76.

Appellant subpoenaed L.B. to testify at the PCRA hearing.  The testimony developed that, after L.B. received the subpoena, she contacted the

---

[1] The transcripts were entered into evidence as Commonwealth's Exhibit 1, which is attached to the PCRA hearing transcript.

prosecutor who tried Appellant's case, who put her in touch with the Assistant District Attorney who handled the PCRA hearing. L.B. stated that the ADA informed her that Appellant was in possession of text messages between L.B. and Mr. Beair, but the prosecution did not reveal what the contents were. N.T., 1/21/16, at 23. Appellant's counsel, reading verbatim from the transcripts, asked L.B. if she ever texted her uncle the following: "OMG, I didn't mean that. I'm so sorry. But for you and your family I will get him out of jail. Even if I ended up in jail myself, I still get him out." *Id*. at 25. L.B. denied saying that, or anything like it. She denied writing, "Yes, I will help you. Am I going to go to jail?" She also denied saying, "If you talk to my dad, tell him [L.B.] said him that I love him, and that I'm so sorry." *Id*. at 29.

On cross-examination, L.B. insisted that she did not send those messages. She also said "Yes" when asked, "Was your testimony at the trial true?" *Id*. at 31. The trial court ordered the Commonwealth to take possession of L.B.'s cell phone for purposes of forensic analysis.

Donald Beair also testified on January 21, 2016, and stated that he had used a program on his phone to generate the transcripts of text messages which he then sent to Appellant and his counsel. During his testimony, Mr. Beair stated that he had the relevant phone on his person, and agreed to provide it to the Commonwealth for analysis. The proceedings adjourned so that the two phones could be analyzed.

On May 10, 2016, the parties reappeared and discussed the results of the forensic analysis. The Commonwealth stated that L.B.'s phone only had one text message from Mr. Beair, but further evidence indicated that L.B. used multiple phone numbers, if not multiple phones. As to the analysis of Mr. Beair's phone, the Commonwealth stated that "the transcript that was provided by Donald Beair appears to be authentic in part." N.T., 5/10/16, at 9. The Commonwealth stated that the analysis of his phone indicated additional messages to L.B. at a third phone number, which were not provided within his transcripts. The Commonwealth's position was that the transcripts supplied by Mr. Beair were authentic, but incomplete in that "it doesn't include the third phone." *Id*. at 11. The Commonwealth stipulated to the authenticity of those messages. "Your Honor, I will agree that the information that is contained in Donald Beair's phone, which appears in the transcript that was provided by Donald Beair does appear to be accurate with the exception of the omission of text messages from Donald Beair's phone to a third phone number."[2] *Id*. at 13.

The conversations between Mr. Beair and the third phone number had also been extracted from his phone and were entered into evidence as Commonwealth's Exhibit 2. That set of phone calls spanned 09/28/14 through

---

[2] No testimony was produced on this point, and it is unclear if the forensic analysis retrieved only those messages still locally present on Mr. Beair's phone, or if additional efforts were made to retrieve messages that may have been deleted.

04/26/15. Those messages indicate a willingness on L.B.'s part to help get her father out of jail.

Simultaneously, the messages revealed that while L.B. would be willing to help Appellant get out of jail, she also stated that she would not lie. *Id*. at 172 ("Listen I will do what I can to help u get my dad out of jail. But I'm not lying. Ur my uncle and I finally got u back for u to be part of my life I don't want u to disappear on me."). At one point, L.B. indicates that she will not sign any type of document stating that she lied. *Id*. at 121 ("Look I'm not gonna fight with u over this. I'm not signing anything or lying about my dad. U do what u need to do but I'm not gonna lie and say something didn't happen when it did.").

Taken together, the messages establish a willingness on L.B.'s part to help her father get out of jail. The parties dispute whether the messages amount to a recantation. According to Appellant, L.B.'s response "I can't remember what b[r]ought it on" when asked why she lied is an "acknowledge[ment] in a text message that she lied during the trial." Appellant's brief at 29. The Commonwealth, in contrast, states that it is unclear if L.B. ever truly recanted within those text messages, as opposed to expressing a generic willingness to "help" her father get out of jail. The Commonwealth concedes that L.B.'s testimony at the PCRA hearing was contradicted by the messages, but also highlights that L.B. testified under oath at the PCRA hearing that she did not lie at trial, and also draws attention

to the messages in which she informs Mr. Beair that she would not lie. The Commonwealth also suggests that Mr. Beair's failure to provide the text messages wherein L.B. states she will not lie for her father bears upon his credibility. The PCRA court's opinion addressed Appellant's claims as follows.

> [Appellant] claims that this Court erred in denying his PCRA Petition based on evidence that [L.B.] stated in a text message to Donald that she lied at Appellant's trial. Presumably, the text message exchange Appellant is referring to occurred on May 9, 2014, On that date, [L.B.] texted Donald that she "will get [Appellant] out of jail" and Donald replied asking [L.B.] why she would "say all those lies." [L.B.] then replied to Donald that she "can't remember what brought it on."
>
> At trial, [L.B.] testified that Appellant physically and sexually abused her over a period of several years. At the PCRA hearing on January 21, 2016, [L.B.] testified that her trial testimony was, in fact, true, and she was not recanting it. Thus, there are no inconsistencies in [L.B.]'s testimony rendered under oath at trial and [L.B.]'s testimony rendered under oath at the PCRA hearing, and, therefore, no actual recantation of her trial testimony has occurred.

PCRA Court Opinion, 9/29/17, at 4-5.

"Our standard of review for issues arising from the denial of PCRA relief is well-settled. We must determine whether the PCRA court's ruling is supported by the record and free of legal error." **Commonwealth v. Spotz**, 171 A.3d 675, 678 (Pa. 2017) (citing **Commonwealth v. Washington**, 927 A.2d 586, 593 (Pa. 2007)). The instant PCRA petition raising this claim is timely, and sought to raise the recantation testimony as a substantive claim of after-discovered evidence. That type of claim is statutory codified as follows "The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the

trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). That subsection applies to recantation claims, and we apply the following principles:

> To obtain relief based upon newly-discovered evidence under the PCRA, a petitioner must establish that: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.

*Commonwealth v. D'Amato*, 856 A.2d 806, 823 (Pa. 2004) (citation omitted). Moreover: "We acknowledge that, as a general matter, recantation evidence is notoriously unreliable, particularly where the witness claims to have committed perjury." *Id*. at 825 (internal quotes and citation omitted). Finally, consistent with the general principle that the presiding judge is in the best position to determine credibility, we may not disturb credibility findings absent a clear abuse of discretion. "[A]n appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion." *Commonwealth v. Hammond*, 953 A.2d 544, 561 (Pa.Super. 2008) (citation omitted).

Applying these principles, we find that the PCRA court committed no error. The gravamen of Appellant's brief is that the PCRA court erred by finding L.B. credible with respect to her PCRA hearing testimony that she did not lie at trial, and therefore asks this Court to find that the PCRA "clear[ly] abuse[d]" its discretion. *Id*.

> In light of [L.B.]'s multiple untruthful statements, there is no way that the PCRA court could have found her credible on any point of fact. Moreover, in light of the evidence as a whole, it is likely that her recantation in text messages was the "true story." In other words, as noted above, there were originally four accusers of childhood sexual abuse, to wit: [L.B.], [R.B.], [P.B.], and [Ra.B.]. Two of the four accusers indicated at trial that there was no abuse and that their grandmother pressured them into telling lies to authorities, including statements made under oath and under penalty of perjury. Now, we have another accuser indicating in a text message that she lied at trial.
>
> When applying the standard of evaluating the evidence as a whole, the PCRA court should have regarded [L.B.]'s recantation in light of the other evidence that was overlooked by the jury and downplayed by the prosecution.

Appellant's brief at 30.

We find that the PCRA court did not clearly abuse its discretion in resolving the fundamental credibility determination as to whether [L.B.] was telling the truth when she stated that she did not lie at trial. As our direct appeal decision recognized, this case is unusual. However, the fundamental problem with Appellant's claim that "there is no way that the PCRA court could have found her credible on any point of fact" is that this principle must equally apply to any purported recantation as told to Mr. Beair.

Appellant, however, asserts that this Court is bound to accept L.B.'s statements to Mr. Beair as the absolute truth, and the basis for doing so is that she lied at the PCRA hearing when she denied telling her uncle that she ever agreed to help her father get out of jail. Appellant asks this Court to overturn a credibility finding on the basis that she demonstrably lied at the

evidentiary hearing.[3]  The difficulty with this argument is that Appellant asks us to find that L.B. is so completely unreliable that she must have lied when she stated that she told the truth at trial.  But if L.B. is so unreliable, then there is little reason to credit her statements to Mr. Beair, assuming *arguendo* that the key statement "I can't remember what b[r]ought it on" in response to "But [wh]y would you say all those lies?" is in fact a recantation. Furthermore, our precedents recognize that recantation testimony is notoriously unreliable, and that principle applies with even greater force to a double recantation, *i.e.*, L.B. recanted her testimony *via* text message, but then recanted her recantation at the PCRA hearing.  Our judicial system places the credibility determination upon the PCRA court, and we find no clear abuse of its discretion in that regard.  That conclusion is strengthened by the fact that Appellant cannot point to any statement by L.B. clearly expressing that she lied at trial.  In fact, later text messages suggest the contrary, and "help" can take many forms.

We now address Appellant's remaining claim that a remand is warranted for the purpose of instructing the PCRA court to reconsider L.B.'s testimony by considering the content of the text messages as it bears upon her credibility.  Fundamentally, we disagree that the PCRA court "never addresses,

---

[3] We view the threshold question herein as whether L.B.'s recantation is itself credible.  Appellant bolsters his claim by referencing the testimony at trial to show that she lied at the PCRA hearing.  This is rather a chicken and the egg problem, in that the conclusion that she lied at trial is strengthened by a conclusion that she lied at the PCRA hearing, but the conclusion that she lied at the PCRA hearing likewise turns on the conclusion that she lied at trial.

in any meaningful way," Appellant's brief at 32, the messages. It is clear that

the PCRA court did so, as reflected in its opinion:

> At the PCRA hearing, [L.B.] expressly denied making any statement via text message to Donald that she lied in court. [L.B.]'s denial is arguably contradicted by the brief text message exchange discussed above between Donald and [L.B.] on May 9, 2014. The Court reiterates, however, that [L.B.]'s testimony rendered under oath at both Appellant's trial and the PCRA hearing is consistent, and after-discovered evidence cannot be used solely to impeach credibility. Additionally, the Court notes that in other text messages extracted from Donald's phone through forensic analysis, [L.B.] indicated that she was truthful at trial and was unwilling to lie about Appellant.

PCRA Court Opinion, 9/29/17, at 6 (citations omitted). Therefore, we find that

the PCRA court assessed L.B.'s credibility in light of the text messages and

her trial testimony, as well as the additional text messages stating that she

would not lie nor sign anything. No relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/27/2018

- 13 -